UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JACOB MICHAEL DIAL
and JESUS PENA,

    Plaintiffs,

v.                                    Case No. 8:23-cv-1650-VMC-TGW

GEICO GENERAL INSURANCE COMPANY,

    Defendant.
_____/

**ORDER**

This matter comes before the Court pursuant to Defendant GEICO General Insurance Company's Motion for Summary Judgment (Doc. # 54) and Plaintiffs Jacob Michael Dial and Jesus Pena's Motion for Partial Summary Judgment as to Geico's Second and Fourth Affirmative Defenses (Doc. # 53), filed on May 8 and 22, 2024, respectively. Both sides have responded (Doc. ## 55, 59), and replied. (Doc. ## 60, 61). For the reasons that follow, Defendant's Motion is granted, and Plaintiffs' Motion is denied.

I.   **Background**

    A.   **The Accident**

This case arises from a motor vehicle loss that occurred on September 29, 2020 (the "loss"). (Def. Ex. A). At the time of the loss, Geico's insured, Jamie Grant, was driving a Honda

1

Accord owned by Kimberlee Pilcher and occupied by passenger Daven Bullock. (Id.). The loss occurred when Grant traveled through a red light and collided with the front right fender of a Ford Fiesta driven by Dial, who was accompanied by his passenger, Pena. (Id.).

At the scene of the crash, drugs were found on Grant's passenger Bullock. (Pl. Ex. A; Pl. Ex. C). Bullock was subsequently arrested for drug possession. (Pl. Ex. A; Pl. Ex. C).

In October 2020, a GoFundMe page was created for Dial that detailed his injuries. (Def. Ex. P at GLC 01763). Also, Dial's mother posted a picture on her Facebook account with a caption stating Dial would be undergoing an above-the-knee amputation the following day. (Id. at GLC 01864-01865).

On November 1, 2020, a GoFundMe page was created for Pena. (Id. at GLC 01447). The GoFundMe page explained that Pena's injuries were caused by a car accident, resulting in Pena's suffering multiple broken ribs, a broken femur, and a fractured wrist. (Id.). It further stated that Pena would not be able to return to work for a minimum of six months. (Id.). Pena's stepfather shared a link to the GoFundMe page on Facebook and tagged Pena's Facebook account. (Id. at GLC 01487).

B.   **The Policy and Notice of Loss**

Geico issued an automobile insurance policy, policy number 6023-95-53-36, to Deanna Lashawn King, providing bodily injury ("BI") coverage in the amount of $10,000 per person and $20,000 per accident. (Def. Ex. B). Importantly, Grant, the driver at fault for the loss, was listed as an additional driver on King's policy. (Id.).

Geico first learned of the loss on November 24, 2020, after Progressive (Dial's insurer) attempted to submit a claim against Grant. (Def. Ex. C at GLC 00001-00002). During the call, Progressive advised that Grant allegedly ran a red light and struck the claimant, resulting in injuries, and provided some other details of the loss. (Id. at GLC 00001-00004). These other details included (1) the names of the individuals involved; (2) the year, make, and model of the involved vehicles; (3) the vehicle and position within that vehicle that each of the involved individuals was occupying at the time of the crash; (4) the name of Geico's named insured, Deanna Lashawn King; and (5) the fact that Grant's use of the insured vehicle was permissive. (Def. Ex. P at GLC 00001-00003).

Geico immediately began its investigation by attempting to contact Bullock to obtain his recorded interview; however,

3

Bullock did not answer or have voicemail. (Def. Ex. C at GLC 00004). Similarly, Geico left a message with King to establish contact concerning the loss. (Id.). That same day, Geico ordered the Police Report and commenced an ISO Claimsearch. (Def. Ex. A at GLC 03404; Def. Ex. D).

On November 25, 2020, Geico received a Notice of Claim from Goldberg & Rosen ("G&R"), advising of their representation of the Plaintiffs and requesting insurance disclosures. (Def. Ex. G).

Later that day, Geico sent Bullock a letter requesting that he contact GEICO to provide a recorded statement and his version of the loss. (Def. Ex. H). Geico then contacted King to inquire as to details of the loss; King was unaware who owned the Accord or why Grant was driving it at the time of the loss. (Def. Ex. C at GLC 00006 at 5:38 p.m., GLC 00007 at 6:04 p.m.).

Geico then spoke with Grant, who claimed that his recollection of the loss was limited as he was unconscious in the hospital for days. (Id. at GLC 00007 at 6:01 p.m., 6:18 p.m.). According to Grant, he was driving the vehicle up the street at the time of the loss but could not recall the purpose of his trip or the passengers in his vehicle. (Id.).

Grant could also only recall the Accord's owner's name but did not provide any contact information for her. (Id.).

On November 27, 2020, Geico sent separate letters to G&R for each Plaintiff, acknowledging their Notice of Claim and requesting that they execute and return a HIPAA Authorization form and an Authorization to Obtain Leave and Salary Information form in order to evaluate their injury claims. (Def. Ex. I; Def. Ex. J). Geico also sent an additional two letters to G&R requesting that Dial and Pena execute and return Medicare authorization forms. (Def. Ex. K; Def. Ex. L).

Plaintiffs never returned any of these forms, nor did they provide any medical information to Geico. (Def. Ex. M at 50:1-51:9).

### C.   Continued Investigation and Communications

On the morning of Friday, November 27, 2020, Geico ran an Accurint search, which confirmed Pilcher was the sole owner of the Accord and that her vehicle registration was expired. (Def. Ex. N). Using the Accord's VIN number, Geico also conducted an insurance carrier discovery report revealing that Pilcher did not actively insure the Accord. (Def. Ex. O; Def. Ex. C at GLC 00014). Thereafter, Geico attempted to call Pilcher to no avail. (Def. Ex. C at GLC 00014-00015).

Minutes later, Geico again attempted to call Bullock, but was unable to leave a voicemail as the same was not supported. (Id. at GLC 00015). Geico also left a message for Grant requesting a recorded interview. (Id.). Likewise, Geico left a message for King as well. (Id.).

Geico then left a message for G&R requesting that Plaintiffs provide recorded interviews, inquiring as to their injury and treatment information, and advising that coverage was still pending. (Id.).

Thereafter, Geico reviewed the Police Report and documented that all the claimants were listed with an injury severity of non-incapacitating. (Id. at GLC 00016 at 8:24 a.m.; Def. Ex. A). Additionally, Geico noted that: Bullock sustained a contusion to his forehead, a right wrist fracture, and internal injuries; Dial sustained a broken left femur; and Pena sustained a broken left femur and issues breathing due to having broken ribs. (Def. Ex. C at GLC 00016 at 8:24 a.m.).

Geico contacted and left messages with Progressive inquiring as to the extent of the claimants' treatment and Progressive's liability decision. (Id. at GLC 00017).

Geico then contacted Tampa General Hospital to determine if any of the claimants were treated at the hospital. During

the call, Geico learned that Dial was treated and released two days earlier, that the hospital did not have any information on Pena, and that it could not release any additional details. (Id.).

Thereafter, the BI claims for both Plaintiffs were transferred to GEICO adjuster Summer-Rose Whiddon. (Id. at GLC 00018; Def. Ex. P at 26:2-14). Whiddon immediately began to review coverage, liability, and damages. (Def. Ex. P at 26:19-24; 29:3-19; 34:2-9; 36:4-6).

Whiddon commenced her investigation by contacting and leaving another message with G&R to obtain Plaintiffs' treatment information and their recorded interviews; to discuss liability; and to advise that coverage was pending. (Def. Ex. C at GLC 00018-00019). Whiddon also attempted to contact Bullock but was unable to leave a message. (Id. at GLC 00021). Whiddon also memorialized that Bullock was transported to Tampa General as a result of the loss. (Id. at GLC 00025).

Whiddon then reviewed the Accurint results in the claim file, noting again that Pilcher was the owner of the Accord, that her license plate was expired, and that the Accord was insured by Progressive. (Id. at GLC 00019-00020). Whiddon then contacted Pilcher at two separate numbers but was unable

to leave a message. (Id. at GLC 00021). Immediately thereafter, Pilcher called Whiddon and hung up after Whiddon advised she was from Geico. (Id.).

Whiddon left a message with King advising that coverage remained pending. (Id. at GLC 00020). She also left a message for Grant advising that Geico needed to obtain his recorded interview, confirm his residency, and ascertain the reason he was driving the Accord. (Id. at GLC 00022).

Geico then referred the Examinations Under Oath ("EUO") of Grant and Pilcher to fee counsel. Thereafter, between November 27, 2020, and December 9, 2020, Geico was in contact with fee counsel regarding the EUO and communicated on various topics to be discussed and issues with scheduling. (Def. Ex. Q).

On November 30, 2020, Whiddon left a message with Progressive advising that coverage was pending. (Def. Ex. C at GLC 00028). That same day, Geico sent Grant a Reservation of Rights letter ("ROR") advising that the Accord may not meet the definition of either an "owned auto" or a "non-owned auto." (Def. Ex. R).

Geico sent additional letters to King and Grant advising inter alia that Geico was operating under a ROR due to Grant operating an unlisted vehicle, the BI coverage limits, the

possibility that the injury claims may exceed the applicable limits, their right to contribute personal funds to any claims made against them, and their right to retain an attorney to protect their interest in excess of the policy limits. (Def. Ex. S; Def. Ex. T). Geico mailed two letters to Pilcher advising her of the claim, memorializing Geico had been unable to contact her, requesting she provide her account of the loss, and informing her that Whiddon was handling the claim. (Def. Ex. U; Def. Ex. V).

On the same day, Whiddon sent Grant and Bullock separate letters requesting they provide a recorded statement of the loss, and that Bullock provide information concerning his injuries. (Def. Ex. W; Def. Ex. X). Geico sent two separate letters to G&R explaining it was investigating a coverage issue under an ROR that may affect the Plaintiffs' claim. (Def. Ex. Y; Def. Ex. Z).

On December 1, 2020, Whiddon left a message for Grant requesting a recorded interview as to coverage, and that he verify his injuries along with those of his passengers. (Def. Ex. C at GLC 00030). Whiddon then sent Grant and King ROR letters due to late reporting of the loss. (Def. Ex. AA; Def. Ex. BB). On December 2, 2020, Whiddon sent Pilcher and Bullock separate ROR letters. (Def. Ex. CC; Def. Ex. DD).

Whiddon also sent Grant a letter explaining, in part, the BI coverage limits, the possibility of claims exceeding the applicable limits, his right to contribute personal funds to any claims made against him, and his right to retain an attorney to protect his interest in excess of the policy limits. (Def. Ex. EE).

On December 7, 2020, Whiddon memorialized that both she and the fee counsel retained to conduct Pilcher's EUO had been attempting to call Pilcher, but that Pilcher consistently hung up the call. (Def. Ex. C at GLC 00034).

Later that day, Whiddon contacted Progressive to inquire if they knew why Grant was driving Pilcher's vehicle or if they had any statements they could share, to which Progressive replied that they did not insure Pilcher's vehicle. (Id.). The following day, Progressive confirmed that it insured Dial's vehicle and that it likewise received no responses when calling Pilcher or Grant. (Id.).

On December 9, 2020, the EUO of Grant and Pilcher were confirmed by fee counsel – Grant's for December 10, 2020, and Pilcher's for January 5, 2021. (Id.). Grant testified during his EUO: that he was not working at the time of the loss; that he drove Pilcher's vehicle at the time of the loss due to his Chevy Impala having issues; that he drove Pilcher's

vehicle sporadically in the past; and that he did not ask permission to drive Pilcher's vehicle on the day of the loss. (Id. at GLC 00038).

On December 16, 2020, Geico reviewed the findings of Grant's EUO, along with the information concerning the claimants' injuries, and determined it would be affording coverage. (Def. Ex. P at 75:16-25; 76:1-9). Geico then referred the matter to Laurie Adams of Kubicki Draper to represent the insureds and in order to set up a global settlement conference ("GSC"). (Def. Ex. C at GLC 00039). Whiddon also called King, Grant, and Pilcher to advise that Geico was affording coverage, and of the plan to move forward with setting a GSC in an attempt to resolve all pending bodily injury claims. (Id. at GLC 00039-00040, GLC 00040-00041 at 10:03 a.m., GLC 00041 10:04 a.m.).

On December 16, 2020, Whiddon left a message with G&R advising that Geico was affording coverage and would be setting up a GSC. (Id. at GLC 00040). Whiddon also followed up on Geico's request for recorded interviews and injury information, and requested a call back. (Id.). Whiddon then attempted to call Bullock to no avail. (Id. at GLC 00041). Whiddon then called Progressive, leaving a message advising that Geico was affording coverage. (Id. at GLC 00043).

11

On December 17, 2020, Whiddon sent Pilcher, King, and Grant each additional RORs. (Def. Ex. FF; Def. Ex. GG; Def. Ex. HH). On December 18, 2020, Whiddon sent Bullock a letter requesting that he complete a HIPAA Compliant Authorization form and an Authorization to Obtain Leave and Salary Information form. (Def. Ex. II).

### D.   **Tender of Policy Limits and Aftermath**

On December 21, 2020, Whiddon sent Bullock and G&R letters advising that Geico was tendering the full aggregate policy limits in order to resolve all of the claimants' bodily injury claims, and of Attorney Adams' involvement in coordinating a GSC. (Def. Ex. JJ; Def. Ex. KK). Therein, Geico again requested that the claimants complete and return the enclosed medical authorizations, or forward any and all medical documentation, treatment notes, and injury information. (Id.).

On December 23, 2020, Kubicki Draper sent a Notice of Global Settlement Conference for January 6, 2021, to Bullock and G&R. (Def. Ex. LL).

On December 28, 2020, Whiddon left a message for G&R requesting confirmation of their attendance at the GSC. (Def. Ex. C at GLC 00050). Similarly, Whiddon attempted to call Bullock to confirm his attendance. (Id. at GLC 00050-00051).

12

On December 29, 2020, Whiddon learned through Melonie Bueno of Kubicki Draper that Bullock: underwent intestinal surgery during which a foot of his intestine was removed; sustained a fractured right wrist; had complaints of intermittent headaches; had several broken fragments in his back; and had right knee pain without fracture. (Id. at GLC 00051-00052). Bueno informed Whiddon that Dial spent eight weeks in the hospital in the ICU; had ten surgeries; had his left leg amputated; had a portion of his small intestine removed, which resulted in the use of an ileostomy bag; and that his hospital bill was $1,808,299.75. (Id.). In addition, Bueno advised that Pena sustained multiple broken ribs, a broken femur which required a rod, a fractured wrist which required surgery, and that his hospital bill was $133,000.00. (Id.).

On December 30, 2020, Geico and Grant's counsel collectively decided to proactively tender a per-person limit to Dial, as it "just learned in the past 24 hours [Dial] lost his leg from the loss with other injuries." (Id. at GLC 00053; Def. Ex. NN at 42:13-24, 44:6-16).

Between December 29, 2020, and January 6, 2021, Attorney Adams communicated with Attorney Mustafa Dandashly, counsel for Dial and Pena, via email inquiring as to Plaintiffs'

attendance at the GSC scheduled for January 6, 2021. (Def. Ex. OO). In response to Adams's inquiries, Attorney Dandashly was evasive in confirming his attendance; instead, he requested that Grant and Pilcher submit to sworn statements and provide financial affidavits prior to the GSC. Attorney Adams worked diligently to comply with the requests and fulfilled both in accordance with Attorney Dandashly's scheduling conflicts. (Id.). Moreover, in response to Attorney Dandashly's scheduling conflicts, Kubicki Draper rescheduled the GSC to January 18, 2021, which Attorney Dandashly agreed to. (Def. Ex. RR).

On January 4, 2021, Whiddon sent a letter to G&R advising that Geico was tendering the BI policy limits of $10,000.00 to Dial. (Def. Ex. SS).

On January 6, 2021, Kubicki Draper sent letters to Bullock and G&R advising of GEICO's tender to Dial, reiterating its global tender of the available policy monies to resolve the remaining claims, and rescheduling the GSC to January 18, 2021. (Def. Ex. TT).

On January 14, 2021, Kubicki Draper received a letter from G&R rejecting GEICO's policy limit tender as untimely and that Plaintiffs would not participate in the GSC. (Def. Ex. UU). Further, Attorney Dandashly testified that as of

14

this date there was no longer an opportunity to settle. (Def. Ex. M at 102:16-26). Attorney Dandashly testified that he could not state when and if he would have recommended settlement. (Id. at 78:24-81:22; 83:7-23). At most, he testified that he believed that twenty days after Geico received notice of the loss was the appropriate time for Geico to tender the policy limits to his clients. (Id.).

Dial testified that he probably would have only accepted the policy limits within the first month or so after the loss. (Def. Ex. VV at 40:20-41:1). Pena could not remember when he would have been willing to accept an amount within the policy limits and also testified that he never gave his attorney permission to settle for $10,000 (the per-person policy limit) or less. (Def. Ex. WW at 28:25-29:4; 32:3-10).

Dial and Pena initiated a state court personal injury action (the "underlying action") against Grant and Pilcher on January 14, 2021. (Doc. # 30 at ¶ 25; Doc. # 36 at ¶ 25; Def. Ex. XX). Geico afforded a defense to both Grant and Pilcher (Def. Ex. C at GLC 00152). Geico did not conduct any internet or social media searches for Dial or Pena until after Dial and Pena filed a lawsuit against Geico's insured, although Geico could have conducted such searches sooner. (Def. Ex. NN at 58:2-59:10).

On January 18, 2021, the GSC was held as scheduled, but none of the claimants attended. (Id. at GLC 00063-00064). Thereafter, on January 20, 2021, Geico decided to tender the remaining per-person limit to Bullock due to the significant injuries he sustained and Attorney Dandashly's rejection of the limits on behalf of Pena. (Id. at GLC 00067). The tender was delivered to Bullock on or before January 28, 2021. (Id. at GLC 00072).

On March 1, 2021, Bullock cashed the $10,000.00 settlement check from Geico. (Def. Ex. C at GLC 00081). Thereafter, Bullock's bodily injury claim was closed on or about May 18, 2021, though Bullock did not sign a release. (Id. at GLC 00103). As Bullock did not sign a release, GEICO sent him letters, attempted to call him, and even sent an investigator to his home in order to speak about the release. The investigator was told by Bullock's mother that Bullock would not be signing a release. (Id. at GLC 00160-00161).

**E.   <u>Procedural History</u>**

On May 17, 2023, consent final judgments were entered in favor of Dial and Pena and against Grant for amounts far in excess of the policy limits in the underlying action. See (Doc. # 30-2) (final judgment in favor of Pena for

$1,250,000); (Doc. # 30-3) (final judgment in favor of Dial for $7,500,000).

Dial and Pena then initiated this action on July 21, 2023, against Geico. (Doc. # 1). They filed an amended complaint on September 15, 2023, asserting bad faith claims. (Doc. # 30). After the amended complaint was filed in this action, Geico filed its answer and affirmative defenses on September 29, 2023. (Doc. # 36). The case then proceeded through discovery.

Now, Geico moves for summary judgment and Dial and Pena move for partial summary judgment as to Geico's second and fourth affirmative defenses. (Doc. ## 53, 54). Both sides have responded (Doc. ## 55, 59), and replied. (Doc. ## 60, 61). The Motions are ripe for review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex Corp., 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true, and all reasonable inferences must be drawn in the

non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538–39 (5th Cir. 2004); see also United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984) ("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is

entitled to judgment as a matter of law on facts that are not genuinely disputed . . . ." (quotation omitted)).

### III. <u>Analysis</u>

#### A.   <u>Defendant's Motion</u>

Dial and Pena argue that Geico acted in bad faith by failing to settle their bodily injury claims against its insured. (Doc. # 59 at 11-12). According to them, Geico committed bad faith because "it failed to minimize the biggest exposures to its insured by not tendering the available per-person limits to Dial more expeditiously and not tendering at all the remaining per-person limits to Pena." (<u>Id.</u>). For its part, Geico insists that it acted in good faith in handling multiple potential claims against its insured that were all likely to exceed the insurance policy's limits. (Doc. # 54 at 1-2, 19-23).

"An insurer, in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." <u>Bos. Old Colony Ins. Co. v. Gutierrez</u>, 386 So. 2d 783, 785 (Fla. 1980) (citation omitted). "For when the insured has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and

settlement, then the insurer must assume a duty to exercise
such control and make such decisions in good faith and with
due regard for the interests of the insured." Id. (citation
omitted). "This good faith duty obligates the insurer to
advise the insured of settlement opportunities, to advise as
to the probable outcome of the litigation, to warn of the
possibility of an excess judgment, and to advise the insured
of any steps he might take to avoid same." Id. (citation
omitted). "The insurer must investigate the facts, give fair
consideration to a settlement offer that is not unreasonable
under the facts, and settle, if possible, where a reasonably
prudent person, faced with the prospect of paying the total
recovery, would do so." Id. (citation omitted).

    "In determining whether an insurer has acted in bad faith
in handling a claim, the totality of the circumstances
standard is applied." Harrison v. State Farm Fire & Cas. Co.,
No. 2:12-cv-205-SPC-UAM, 2013 WL 12147771, at *7 (M.D. Fla.
Dec. 11, 2013) (citation omitted), order clarified, No. 2:12-
cv-205-SPC-UAM, 2013 WL 12156036 (M.D. Fla. Dec. 19, 2013).
"While the issue of whether an insurer acted in bad faith is
ordinarily a question for the jury, courts have, in certain
circumstances, concluded as a matter of law that the insurance
company did not act in bad faith." Id. (citation omitted).

"Finally, a valid bad faith claim requires 'a causal connection between the damages claimed and the insurer's bad faith.'" Mesa v. Clarendon Nat. Ins. Co., 799 F.3d 1353, 1359 (11th Cir. 2015) (quoting Perera v. U.S. Fid. & Guar. Co., 35 So. 3d 893, 903-04 (Fla. 2010)).

No reasonable jury could conclude that Geico acted in bad faith in its handling of this multiple-claimant accident. An insurer's "good faith duty to the insured requires it to fully investigate all claims arising from a multiple claim accident, keep the insured informed of the claim resolution process, and minimize the magnitude of possible excess judgments against the insured by reasoned claim settlement." Farinas v. Fla. Farm Bureau Gen. Ins. Co., 850 So. 2d 555, 561 (Fla. 4th DCA 2003). An insurer has a duty to abstain from "indiscriminately settl[ing] with one or more of the parties for the full policy limits" in a multiple claimant situation. Shuster v. S. Broward Hosp. Dist. Physicians' Pro. Liab. Ins. Trust, 591 So. 2d 174, 177 (Fla. 1992).

Here, Geico only learned of the accident at issue on November 24, 2020. (Def. Ex. C at GLC 00001-00002). Within twenty-seven days — during which time Geico attempted to communicate with the insureds and the three potential claimants about the accident, as well as obtained the police

22

report and contacted the hospital — Geico tendered the per-accident limits on a global basis to the three claimants on December 21, 2020. (Id. at GLC 00006-00007; Def. Ex. JJ; Def. Ex. KK; Def. Ex. A at GLC 03404; Def. Ex. D; Def. Ex. H); see Valle v. State Farm Mut. Auto. Ins. Co., No. 08-22117-CV, 2010 WL 5475608, at *3 (S.D. Fla. Jan. 15, 2010) (granting summary judgment for insurer where "a mere 30 days after it learned of the accident, [the insurer] initiated settlement negotiations and expressed a willingness to settle with all claimants for the maximum policy amount"), aff'd sub nom. Valle v. State Farm Mut. Auto. Ins. Co., 394 F. App'x 555 (11th Cir. 2010). Two weeks later, on January 4, 2021, Geico tendered the per-person limit to Dial, which Dial subsequently rejected on January 14. (Def. Ex. SS). In the same January 14 letter rejecting the tender to Dial, Dial and Pena's counsel stated that Pena also would not be accepting a tender from Geico and would not participate in the global settlement conference Geico had scheduled. (Def. Ex. UU).

Notably, Dial and Pena's counsel never returned any of the authorization forms Geico requested they sign so that Geico could obtain information about Dial and Pena's medical situation, medical leave, and salaries. (Def. Ex. M at 50:1-51:9; Def. Ex. I; Def. Ex. J; Def. Ex. K; Def. Ex. L). This

decision by Plaintiffs' counsel necessarily lengthened the time for Geico to ascertain the extent of their damages. See Montanez v. Liberty Mut. Fire Ins. Co., 824 F. App'x 905, 912 (11th Cir. 2020) ("[G]iven the lack of communication from Plaintiff [the estate of one of multiple claimants], we see no evidence in the record suggesting that Defendant [insurer] knew it was exposing its insured to excess liability by failing to immediately tender the full policy limits for the wrongful death claim and by proposing a global settlement conference 32 days after first learning of the accident and before receiving any of the medical records that it repeatedly sought during that period.").

"[B]ecause there were multiple claimants, [Geico's] decision to pursue a global settlement was consistent with its duty of good faith under Florida law." Mesa, 799 F.3d at 1360. Importantly, "it is not unusual for settlement negotiations to last several months." Id.; see also Gen. Sec. Nat'l Ins. Co. v. Marsh, 303 F. Supp. 2d 1321, 1326 (M.D. Fla. 2004) (finding that, where insurer tendered its policy limits to both claimants on a "global basis" and allowed the claimants several months to negotiate a global settlement, insurer did not act in bad faith as a matter of law).

Thus, Plaintiffs' assertions that the full policy limits should have been tendered sooner — despite the full per-accident policy limits being tendered on a global basis less than a month from Geico's learning of the accident — are unavailing. See Valle, 394 F. App'x at 557 (affirming grant of summary judgment for insurer where the plaintiff claimant "offered no evidence to demonstrate that [the insurer] knew or should have known that its four-and-a-half month resolution of a policy proceeds distribution in a fatal car accident case involving eight potential claimants increased [its insured's] exposure to excess liability"). On these facts, taken in the light most favorable to Plaintiffs, no reasonable jury could conclude that Geico acted in bad faith. See Eads v. Allstate Indem. Co., No. 14-CIV-61791, 2016 WL 3944072, at *10 (S.D. Fla. Jan. 26, 2016) ("The undisputed facts, even when viewed in Plaintiff's favor, reveal that Allstate acted reasonably and in accord with its duties: Allstate fully investigated all claims arising from the Accident, sought to settle as many claims as possible within the Policy's limitations, minimized the magnitude of possible excess judgments against its Insureds, and kept the Insured fully apprised of the claims resolution process.").

Plaintiffs' emphasis on the existence of their families' social media posts — as evidence of the extent of their injuries that Geico could have independently located — is unpersuasive. (Doc. # 59 at 4-6, 13). Within a day of learning of the accident, Geico became aware that Dial and Pena were represented by counsel. Geico's efforts to obtain information about the extent of Plaintiffs' injuries and their medical records from their counsel, in addition to Geico's independent efforts to obtain the police report and contact the hospital, were reasonable. Any delay does not appear to be of Geico's making, given that Attorney Dandashly acknowledged that he never provided any signed authorization forms or medical records to Geico. (Def. Ex. M at 50:1-51:9). Even without the benefit of Plaintiffs' cooperation and with limited information, Geico determined within a month that the multi-claimant accident warranted a tender of the full per-accident policy limits to be apportioned through a global settlement conference.

Likewise, Dial and Pena's focus on the character of and criminal charges against the third claimant, Bullock, is unconvincing. (Doc. # 59 at 2-3, 6). The existence of criminal charges against Bullock for drug possession does not suggest that Bullock lacked a strong claim against Geico's insured.

Like Dial and Pena, Bullock was severely injured in the accident caused by Geico's insured. See (Def. Ex. C at GLC 00051-00052) (reporting that Bullock underwent intestinal surgery, during which he had a foot of his intestine removed, had sustained a fracture to his right wrist, had complaints of intermittent headaches, had several broken fragments in his back, and had right knee pain without fracture). Geico's attempt to reach a global resolution with all three claimants within the $20,000 per-accident policy limits was an appropriate effort to protect its insured from an excess judgment that any of the three claimants might have obtained.

Furthermore, there is no genuine dispute of material fact that Geico never had a realistic opportunity to settle Dial and Pena's claims. See RLI Ins. Co. v. Scottsdale Ins. Co., 691 So. 2d 1095, 1096-97 (Fla. 4th DCA 1997) ("The correspondence between counsel for the injured plaintiff and the insurers, and the depositions taken in this case, particularly that of counsel representing the injured plaintiff, show beyond any doubt that the primary insurer at no time missed an opportunity to settle which would have put it in a bad faith posture. Accordingly, viewing the facts in the proper summary judgment perspective, we conclude that the trial court was correct in disposing of this claim.").

"Although Florida law provides that the focus of a claim for bad faith should be on the conduct of the insurer, rather than the conduct of the claimant, the claimant's unwillingness to settle the claim is relevant to whether the insurer acted in bad faith under a totality of the circumstances and is a factor that must be considered." Losat v. Geico Cas. Co., No. 8:10-cv-1564-EAK-TGW, 2011 WL 5834689, at *6 (M.D. Fla. Nov. 21, 2011).

Geico did not have a realistic opportunity to settle with Dial and Pena. Dial testified that he probably would have only accepted the per-person policy limits within the first month or so after the accident. (Def. Ex. VV at 40:15-41:1). Geico did not receive notice of the accident, however, until more than a month after the accident. Thus, by the time Geico learned of the accident, Dial had already decided not to settle. Pena testified that he never gave his attorney permission to settle for $10,000 (the per-person policy limit) or less. (Def. Ex. WW at 28:25-29:4). Pena could not remember when he would have been willing to accept an amount within the policy limits to settle with Geico's insured. (Id. at 32:3-10). Attorney Dandashly, who represented both Dial and Pena, testified that he could not state when and if he would have recommended settlement. (Def. Ex. M at 78:24-

28

81:22; 83:7-23). At most, he testified that he believed that twenty days after Geico received notice of the loss was the appropriate time for Geico to tender the policy limits to his clients. (Id.). Also, as of late December 2020 or early January 2021, Attorney Dandashly had already determined that any policy limit tender by Geico would be untimely, and he would not have recommended his clients accept it. (Id. at 94:6-10). Thus, before Geico had even obtained medical records for the potential claimants and before the scheduled global settlement conference, Attorney Dandashly had decided that Dial and Pena should not settle with Geico.

For these reasons, summary judgment is granted in favor of Geico.[1]

---

[1] Alternatively, even if there were genuine disputes as to issues under Florida common law, the Court would grant Geico's Motion for a different reason. Florida Statute § 624.155(4)(a) provides: "An action for bad faith involving a liability insurance claim, including any such action brought under the common law, shall not lie if the insurer tenders the lesser of the policy limits or the amount demanded by the claimant **within 90 days after receiving actual notice of a claim** which is accompanied by sufficient evidence to support the amount of the claim." Fla. Stat. § 624.155(4)(a) (emphasis added). This statute went into effect on March 24, 2023 — before Plaintiffs obtained final judgments against Grant on May 17, 2023, and before Plaintiffs initiated this action on July 21, 2024. See (Doc. # 41-1 at 39) ("Except as otherwise expressly provided in this act, this act shall apply to causes of action filed after the effective date of this act."); see also (Doc. # 53 at 4; Doc. # 55 at 3) (Plaintiffs and Geico agreeing this statute went into effect on March 24, 2023).

### B.   **Plaintiffs' Motion**

Because   the   Court   has   already   found   that   summary judgment   should   be   granted   for   Geico,   Plaintiffs'   Motion   is denied.

Accordingly,   it   is   now

---

Importantly, Geico tendered the policy limits on a global basis within ninety days and also offered the per-person policy limit of $10,000 to Dial within ninety days. Because it is undisputed that Geico tendered the policy limits within ninety days, no bad faith claim can survive under Section 624.155(4)(a).

The Court agrees with Geico that applying the amended Section 624.155 to this case is not a retroactive application, given the statute's effective date before this case's filing and before entry of final judgment in the underlying action. (Doc. # 55 at 4-5; Doc. # 54 at 18-19). Even if Plaintiffs, as third parties, have rights under the insurance contract, the amendments to Section 624.155 did not affect any rights under the policy. (Doc. # 55 at 11-16). Plaintiffs' "right" to file a bad faith action against Geico did not arise until the final judgments were entered against Grant in May 2023 (after the effective date of the statute). See Kelly v. Williams, 411 So. 2d 902, 904 (Fla. 5th DCA 1982) ("[A] cause of action for bad faith arises when the insured is legally obligated to pay a judgment that is in excess of his policy limits."); Williams v. Am. Optical Corp., 985 So. 2d 23, 27 (Fla. 4th DCA 2008) ("Florida law is well established that the right to sue on an inchoate cause of action — one that has not yet accrued — is not a vested right because no one has a vested right in the common law, which the Legislature may substantively change prospectively."), aff'd sub nom. Am. Optical Corp. v. Spiewak, 73 So. 3d 120 (Fla. 2011); Universal Prop. & Cas. Ins. Co. v. Laguna Riviera Condo. Ass'n, Inc., No. 2D2023-0034, 2024 WL 2267783, at *3 (Fla. 2nd DCA May 17, 2024) ("Universal, standing in the Perezes' shoes, did not have a vested right to sue the Association until July 13, 2021 — after the amendment to section 627.714(4) became effective.").

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendant GEICO General Insurance Company's Motion for Summary Judgment (Doc. # 54) is **GRANTED.**

(2)   Plaintiffs Jacob Michael Dial and Jesus Pena's Motion for Partial Summary Judgment as to Geico's Second and Fourth Affirmative Defenses (Doc. # 53) is **DENIED.**

(3)   The Clerk is directed to enter judgment in favor of Defendant and against Plaintiffs and, thereafter, **CLOSE** this case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 19th day of July, 2024.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE